Our second case this morning is No. 18-1987, Pabst Licensing v. Apple. I have a motion to adjourn, a second to adjourn, a motion to adjourn, a second to adjourn, Okay, may it please the Court. I'm going to use my time today to make two points. The first point is that the Board's findings that the recognition limitations for the 399 patent are obvious, lack substantial evidence under the Court's recent ruling in personal Web II. The second point I'm going to make today is that the Board's findings that the communication limitations for the 399 patent are obvious, lack substantial evidence because those findings are directly contrary to expressed teachings of the references themselves, which were not addressed by the Board. With regard to the recommendation... Is it fair to say you don't challenge the Board's claim construction of customary driver? Claim construction of customary driver? Yeah. We do not challenge the Board's claim construction of... in which proceeding? The proceeding we have here, the IPR we have here. In the proceeding of ITAC, with the claim construction we challenged in the Kawaguchi proceeding were the input-output device and the definition of and. We don't challenge the other claim constructions in the other proceedings. Okay. Regarding the recognition limitations under personal Web, this Court recently ruled when making an obviousness analysis, the mere fact that a certain thing may result from a given set of circumstances is not sufficient. In that case, what they said is if an equally plausible or if more plausible result for understanding exists, then the reference, and it shows that the reference or the limitation is not disclosed, then that reference is not invalidating. In this case, the Board and the petitioners below agree that Kawaguchi, Pucci, and ITAC do not disclose the ITAC limitations. Instead, they rely on the SCSI specification to infer that each of the interface devices identifies to the host device with the hard disk code 00H in response to an inquiry from the host computer. Even assuming that the interface devices do receive an inquiry, the more plausible result under the SCSI specification is that they identify themselves as unknown devices and then they use software installed on the host device to communicate. The reason for this is this. I'm concerned, as I was concerned in the previous appeal, that this particular issue wasn't actually raised by you in front of the patent board, in your patent owner response. The other side explains in their rhetoric why, at least when it comes to this automatic recognition inquiry type limitation, that wasn't really up for debate, at least by your side in the patent owner response. Well, we believe it was. With respect to Kawaguchi, the argument was made below in the patent owner response. About the ATAC IPR. About the ATAC IPR, I'll address that specifically. We do believe it was also made there, Your Honor. It was made below at appendix 10066. That's cited ATAC at column 10, 28 through 35. That's at appendix 8033. It was also made at appendix 10060 to 61. Okay, I'm sorry. Could you start over again? 100... 10066. Which volume? I believe 10066 is in... I'm sorry, I don't have the volume references. I believe that's in volume 3. I would have to check. 10066? Yes, Your Honor. That would be the last. Volume 4. Okay. 10064? 66. 66, where we cite ITAC. And then also at 6061. I'm sorry, 10061? 10060 through 61. Oh. And then it was also in Mr. Gafford's attached declaration of 10009. And to explain the sole passage from ITAC cited by a petitioner in response for its conclusion that the CAD box identifies as a hard drive to the PC is, quote, the CAD box looks like a hard drive to the PC. Well, the patent owner below directly challenged that factual predicate. It said that's not right. It said ITAC actually discloses that ITAC's CAD box not only appears as a disk, but it also appears as a remote modem or a modem, a print server, or a remote fact. And Mr. Gafford, remote facts. And so Mr. Gafford said the same thing in his declaration. The patent owner further challenged the petitioner's obviousness conclusion in the section because it relied solely on what it called conclusory testimony unsupported by concrete evidence. And in that section, the patent owner referred expressly to the communication limitations or not the communication, the recognition limitations of the allegations regarding the recognition limitations of the 399 patent. It referred to paragraphs 52 and 53 of the petition, which discussed the understanding with regard to claim command interpreters that do the signaling. It referred to the petition at 55 where it expressly discussed the signaling and the conclusion that the recognition limitations are met. Also at 67 to 68. And in those areas where it identified the application of the SCSI specification to conclude that a POSITA would have understood that ITAC sends a hard disk identifier. So in each of these cases, what we found is that the petitioners admitted that the prior devices are not SCSI hard drives. But under the SCSI spec, in response to an inquiry, the spec says you can only identify as one of 12 different device categories, including 00H and 1FH for unknown device. Under the SCSI specification, a peripheral cannot misidentify. And this is unchallenged by the board and unchallenged by the petitioners. So what did ITAC mean when it said over and over again that the cat box or the cat disk is going to look like a SCSI hard disk to the PC? That means we believe from reading of ITAC, the only conclusion you come to is that it's emulating a hard disk through the use of installed software. And that installed software solely is doing the communication. And that installed software is solely doing the identification of ITAC to the host computer. What is the PAPS disclosure doing when it says it's interface devices simulating a hard disk? I don't see any explanation in the PAPS specification for how that is being accomplished and what that means. That could be different than what ITAC is contemplating when ITAC says that its cat disk looks like a hard disk to the PC. The 399 addresses that issue specifically. Unlike ITAC, which basically says it just looks like a hard disk, which would be emulation of any type, installed software, 399 addresses it specifically and says the interface... All of the PAPS specifications should be the same, right? That's a good issue in this case. Okay, so when you say 399 addresses this specifically, I'm just asking about the written description. The written description? The written description explains what your invention does to, I don't know, to simulate a hard disk. It says expressly that it simulates both in terms of hardware and in terms of software. And it says that is on the interface device. That's a disclosure that is absent from ITAC, absent from Pucci, and absent from Kawaguchi. It's that explanation that distinguishes the two because... But where in the PAPS specification does it explain all this? Because it's just so... I didn't really see much of an explanation. It is in the specification of 399. I do not have the citation handy right now. I'll provide it to you in reply. Under the SCSI spec, the peripheral must identify as what it is. It can't misidentify. And the petitioners admit that these interface devices are not hard disks. Therefore, under the SCSI spec, they cannot identify as hard disks. We think the more plausible result is that they identify as what they are, which is an unknown device, and then use installed software to communicate. And this is supported by the references themselves. If you look at Kawaguchi, Kawaguchi discusses modification required to be connected to the OS computer and the STC. Pucci also discusses the use of specialized software on the, quote, ION system, which Pucci identifies as both the ION node and the software on the workstations. And the board agrees with that. The board agrees that the software on the, quote, ION system does the emulation. And it's also supported by ITAC itself, which says that for each file transfer, installed software is needed. So in conclusion, if you understand that each alleged interface device is not a hard drive, and SCSI does not allow it to identify as a hard drive, the only plausible conclusion is that it identifies as an unknown device under the SCSI spec. I'm going to move quickly on the communications limitations, but essentially, because I'd like to reserve some more time, essentially neither Pucci nor ITAC, or the conclusions by the board under Pucci and ITAC, are contrary to the express statements in those references themselves. Pucci does not state that it uses the SCSI disk driver. They just infer that the SCSI disk driver is used. But if you look at what Pucci actually disclosed, it discloses application software installed on the workstation. The board agrees with that. The board's position was only that it uses the application software to transfer the data, but it also uses the SCSI driver to transfer the data. But if you look at disclosure, that's directly contrary to the disclosure, because the application contains three tasks. The third task, quote, defines a SCSI action function, and it says that the third task is what, quote, interfaces to the SCSI bus and returns data to the workstation when requested. Pucci expressly discloses that the installed software does the data transfer, not the SCSI driver. We have an express disclosure on the patent owner's side from Pucci. On the petitioner's side, we have an inference made solely from the fact that the ION node looks like a hard drive. Same issue with respect to ITAC. The board concluded that ITAC communicates because it has the presence of ASPI drivers on the PC. But the board did not consider the pseudocode, or the functionality of the pseudocode, that says the CATSYNC driver intercepts and, quote, replaces. That means the CATSYNC driver is the driver that is sending the communication over the SCSI bus. It even says it sends it over loon zero, which is normally the loon that is used for the ASPI driver. It precludes the ASPI driver from communicating with the peripheral device by intercepting the file call and replacing it with its own file call. And that is expressly disclosed. So, again, we have on our side an express disclosure that says the only thing that does the file transfer or the communication is the installed software, the CATSYNC driver. On the petitioner's side, we have an inference. You use a SCSI driver only because it appears as a disk. You want to save the rest of your time for rebuttal? I do, Your Honor. Mr. Hollowood, Warden Cronwyer, please. May it please the Court. The Board found across three IPRs on the basis of three different prior art references that every one of the challenge claims is unpatentable as obvious. Those findings are amply supported by substantial evidence, but the Court need not reach that question because every one of those findings has already been made in prior IPRs that are now final as a consequence of their dismissal of the appeals. It's as though they were never appealed. In December of 2017, those findings were made. Our final written decision was not issued until March of 2018. So those final written decisions, the findings of fact in those actions, preclude each and every one of the arguments that PAPS is making, especially with respect to the ATEC reference. And, Your Honor, Judge Dyke, you are right that their arguments in their supplemental just really miss the arguments that we're making. We're talking about the subsidiary factual findings about what does ATEC disclose, how does ATEC operate. Those findings of fact with respect to the disclosures in ATEC were necessary to the conclusions that the Board reached in those final written decisions, and they are the precise assertions of findings of fact that were made here as well and that PAPS is contesting in this appeal. So even though... So then under these circumstances, a patent owner like PAPS here basically just has to fight to the death across all of the patents because if it gives up on one, it ends up giving up on all? That's right, Your Honor. Well, no, it's actually not right. All they need to do is say we'll dismiss if you'll stipulate it's not valid. Exactly, Your Honor, and they made no outreach to us about that to negotiate what that would be. But the service case, the footnote 1... Would they stipulate with the canon and everybody else over there or would they be stipulating with you? Well, I think, Your Honor, that that question highlights one of the difficulties because the IPR final written decisions are binding against PAPS under the doctrine of non-mutual collateral estoppel for the world. Everyone in the world, not just those who were the petitioners in those proceedings, but everybody is entitled to rely on and not to have to relitigate those questions that PAPS has already lost on. They wouldn't have to stipulate with the world that it was not going to be collateral estoppel. That would only have to be with respect to us. That's right, with respect to us in these appeals. But I think that it's important to note that collateral estoppel is something that applies once the decision has become final. And their dismissal of their appeals, after they had put us through all of the burden of filing briefs on it, and Your Honor is starting to prepare for argument on it, renders it though as though they were never appealed. Those final written decisions are final. You've mentioned that a couple of times. Does it really matter that the final written decision here was in February 2018 and the 144 and 746 were in December 2017? I only note that because they're suggesting that they were trying to avoid unnecessary burdens. Help us out. Help us out. Well, had they not appealed those, the board would have been entitled to rely on collateral estoppel once those final written decisions had become final. I'm trying to understand why that makes any difference or whether it's exactly the same. If one says on March 29th or 20th or whatever it was that the appeal was dismissed, those decisions became final, and once there's finality, then the still pending cases at that point are subject to collateral estoppel. Your Honor is correct. As soon as the judgment becomes final for purposes of estoppel effect, that's the relevant time. And here, because they initially filed the notice of appeal, they would not have had estoppel effect. Once they dismissed the appeals and the mandate issued, they do have estoppel effect. My point was that had they simply not appealed from the beginning, not put us through the burden of responding to the appeals, those IPRs would have become final even earlier, and in fact the board would have been entitled to rely on them in the March 2018 final written decisions at issue here. So there is no argument that I see in justice that should relieve them of the consequences of their decision to dismiss the appeals. They had some reason to do that. They may have thought that those factual issues teed up worse in those earliest of the appeals that the court was going to address first. Whatever their reasons were doesn't matter. They made the decision to dismiss without entering into any agreement with us, and they live with the consequences of that. When you say yes, you mean the entire group that you were standing up and arguing for today. Apple wasn't part of those, right? Apple was not part of those. Samsung was. Samsung was. So, Your Honor, they've argued in their supplemental brief or tried to argue that there were some of the findings of fact in those previous IPR final written decisions that were not necessary, and I would like to address that here because their arguments are misleading, and I think quite egregiously so. For example, with respect to the 746, they assert on page A of the supplemental brief that whether ATAC discloses an identifier sent in response to an inquiry from the host device was not necessary to the board's decision in respect to 746 Patent's independent claims. Now, that is a true statement with respect to the independent claims. Is this the Claim 84 point that you've encoded? No, Your Honor. They omit to reference that 746 Dependent Claim 15 requires that the at least one parameter is consistent with the device being responsive to a SCSI inquiry command. So this precise issue that they say was not necessary to decide the independent claim, whether it's responsive to a SCSI inquiry demand, is essential to Dependent Claim 15, and at the 746 ATAC final written decision at 32, it specifically addresses Claim 15 and says that it is unpatentable because, quote, the SCSI protocol includes the inquiry command in response thereto. So that was clearly a necessary finding to that. With respect to their assertion, again, that the 399 Patent expressly requires use of a customary driver for a customary device previously identified in response to an inquiry and that that's not necessary for the 746 Patent's independent claims, 746 Dependent Claim 17 requires that after the at least one parameter has been sent without requiring any end user to load any software. With respect to that claim, 17, 746 ATAC final written decision at 33 to 34 addresses specifically after the parameter has been sent limitation and says ATAC's CAT box responds automatically to the inquiry command and enables the file transfer without the user loading any software, and that's based on additional subsidiary factual findings on that page, including that the SCSI driver is a customary driver. Each one of these factual findings was essential to a determination made in those proceedings. Another, I thought, equally misleading contention was that the 144 did not require the board to find misidentification and that that somehow distinguished it from the 399. Now, misidentification, of course, nowhere appears in the 399 claim limitations. Misidentification is the function of two different elements, the elements being that it signals that it's an I-O device customary to a host device and that it does so, quote, regardless of the type of the data transmit-receive device attached. Well, no one's contesting that the SCSI driver hard disk command is a customary device to the host device. The only question is, does ATAC signal that it is a SCSI hard disk device? And in connection with that, the 144 ATAC final written decision at 38-39 explicitly finds, as part of finding that the recognition process was disclosed, that Cat Box of ATAC would respond to an inquiry command by sending identifying information about a simulated SCSI disk drive. So in each of these instances, what they say was not essential to decide, was, in fact, decided was essential to decide those arguments fail. And so the court need not go beyond collateral estoppel in this case. But if it does go beyond collateral estoppel, the board's findings are adequately supported or amply supported by substantial evidence. I do want to specifically address, though, the question of whether the inquiry and response limitation was raised by Pat and Oner below. All of the arguments we heard today about where that was raised are new. I heard them for the first time today. The gray brief does not point to any place in the Pat and Oner response where any argument was made about the inquiry and response. I did a search. I did a search for misidentification. I did a search for unknown device. I did a search for 1FH. None of those terms appears in the Pat and Oner response. This argument was not made. What they do argue in the gray brief, as they did in the blue brief, was the argument of attorney about what the SCSI specification means. And now, that is important. It's important to hold them to their waiver. Why? Because they never raised that in the ATAC proceeding. It was never elicited in Dr. Gafford's testimony and deposition that, as your question indicated, Judge Shen, the 399 patent operates exactly the same way. It's ATAC, Apucci, Kawaguchi, that the interface device returns a signal that it is a hard disk, even though it is not a hard disk. The suggestion by counsel here today that that would render it inoperable was not made below an ATAC. It wasn't addressed. But had it been, we would have elicited this same testimony, and it's Dr. Gafford's testimony of A7086, 7087. And he was asked, well, it doesn't specify in the 399 what that response is. He says, well, it says it appears as a hard disk. So we know from that that it would send the response of a hard disk. That is the same logic that Dr. Almaroth applied in the ATAC or Dr. Zadok applied in Kawaguchi and Apucci. And to suggest that it's impossible for our experts to make that same induction as their own expert makes about how the 399 patent works is not a fair argument to make, but it's certainly not fair to make for the first time on appeal when you never raised it before the board below. So with respect to the customary driver limitation, again, the findings are ample. And most importantly, they are an area in which our expert and perhaps experts agreed. Dr. Gafford's acknowledgment, and this is at A10113, paragraph 59, was that CatBox would reliably transfer good data without using CatSync if the CatBox was being used as a remote hard disk for the PC. What CatSync does is it helps to process. When there are these multiple types of activities that CatBox would allow, you have to have a synchronization. You have to have a processor that does that. But if it's only acting as an external hard drive, you don't need that. And so you don't use the CatSync. And without using CatSync, it reliably transfers the good data. Now, their argument about having to be able to do multiple things, interestingly, they made the opposite argument before this court in the prior appeal, and this court... Let's assume for the moment that the way ATAC works is every single time CatSync kicks in, every single time CatSync intercepts the file call from the PC, from the SCSI drivers, and basically stops it in its tracks, throws it away, and replaces it with a new call, the CatSync call. And so therefore, is the file transfer really being done by means of the CatSync call? The 399 patent does not include the without requiring limitation. They try to import that. It simply says using or by means of the host driver or the customary driver. And what the testimony of Dr. Almiroth was, and it was again the concession of Dr. Gafford, was that that transfer of data happens with the SCSI driver. It may be that, and I don't agree with this, and it's not what the testimony of the experts was below, but even if you assumed that that was required, that paragraph that they've cited in column 10, what it suggests is that it's acting basically as a tube, and the ASCII read command is being sent through it. It's not doing anything. And therefore, it is the ASCII driver, it's the SCSI protocol that is being used to transfer the data. That's what the board found. They had two experts who so testified that supported it, and that is ample. But again, the court need not reach that, because it was the same finding that was made by the board and other proceedings that are now final.  Thank you. Thank you. I'd first like to address the collateral estoppel argument. Under Ohio Willow and the other cases, the first step that's supposed to be performed is a comparison between the claim language, and then you determine whether the differences between the claim language are true. No. I mean, that's when you're trying to say that the claim is precluded by collateral estoppel. This is an argument that subsidiary issues are resolved by collateral estoppel. But even the argument that the subsidiary issues have been resolved in the previous proceeding are incorrect, Your Honor. With respect to the claim that the inquiry from the host was resolved by Claim 15 of the 746, Claim 15 of the 746 merely says that the one parameter is consistent with being responsive to a SCSI inquiry command. All that requires is that the one parameter is on the menu of the 12 different parameters that's in SCSI. It does not invoke the inquiry and response. And when you invoke the inquiry and response, which is in the 399 patent, that response to the inquiry necessarily invokes the rules of SCSI, which say you cannot respond as something you are not. This does not require a response. It just says that it has to be one of the devices out of the 12 categories. It's in Table 12-1 of Schmidt. That's not a distinction. The other point I'd like to address is this claim that Mr. Gafford testified that the CAT box would reliably transfer data by means of the SCSI driver. Mr. Gafford's testimony went to the embodiment in which the CAT box or the CAT disk is used solely as a disk. That's not the embodiment that the petitioners relied upon. They relied on the embodiment that does the full analog-digital conversion and everything else that is required by the 399 patent. If you rely solely on the embodiment where the PC connects merely to the disk and that's the only functionality, well, then you lose all the other limitations of the 399. When you're relying on the embodiment that they relied on, it has to have those other characteristics, and in that situation it cannot use the ASPE disk for the reason I explained earlier. Okay. Thank you, Mr. Professor. Thank you. Council, the case is submitted. That concludes our session for this morning. All rise. The audit report is adjourned until tomorrow morning at 6 o'clock a.m.